# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KRISTOPHER BAUMANN,

    Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

**Civil Action No. 09-1189 (CKK)**

## MEMORANDUM OPINION
(March 27, 2013)

Plaintiff Kristopher Baumann, Chairman of the District of Columbia Fraternal Order of Police ("FOP") and an Officer with the District of Columbia Metropolitan Police Department ("MPD"), brings this action against the District of Columbia, Chief of Police Cathy L. Lanier, Assistant Chief Patrick Burke, Assistant Chief Michael Anzallo, Commander Christopher Lojacono, and Lieutenant Dean Welch, each in their individual and official capacities (collectively, "Defendants"). The claims arise out of MPD's investigation of the release to the media of audio transmissions between members of MPD's Emergency Response Team during a barricade situation, and the Plaintiff's testimony during an arbitration regarding Chief Lanier's All Hands on Deck initiative. The Third Amended Complaint alleges (1) the Defendants violated the District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq.*; (2) the Defendants retaliated against the Plaintiff for exercising his First Amendment rights, in violation of 42 U.S.C. § 1983; and (3) the MPD's media policy, MPD General Order 204.1, is an unlawful prior restraint in violation of the First Amendment. Presently before the Court is

Defendants' [87] Motion for Summary Judgment.   Upon consideration of the pleadings,[1] the relevant legal authorities, and the summary judgment record, the Court finds that although Plaintiff's claims are not preempted by the Comprehensive Merit Personnel Act, no reasonable jury could conclude the Plaintiff made a protected disclosure for purposes of the Whistleblower Protection Act.   The Plaintiff's First Amendment claims are similarly not pre-empted, but no reasonable jury could conclude the protected activities identified by the Plaintiff were substantial or motivating factors in prompting the allegedly retaliatory acts.   Finally, the parties failed to employ the proper legal standard in evaluating the Plaintiff's claim that MPD General Order 204.01 as applied in this case constitutes an unlawful prior restraint.   Accordingly, the Defendants' motion is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.

## I. BACKGROUND

### A.  *Barricade Incident & Initiation of FOP Safety Committee Investigation*

The parties generally agree as to events at issue; the dispute arises in determining the motivation for certain conduct.   On Saturday May 30, 2009, the MPD Emergency Response Team ("ERT") responded to an incident in which a suspect barricaded himself inside a residence. Defs.' Stmt. ¶ 19.[2]   During the standoff, the following radio exchange, excerpted in relevant part, took place between members of the ERT:

> 08:31:       Command to Alpha One, be advised I'm being ordered to give you the go to deploy gas.  Copy?

---

[1]  Defs.' Mot. for Summ. J., ECF No. [87]; Pl.'s Opp'n, ECF No. [89]; Defs.' Reply, ECF No. [91]; Pl.'s Suppl. Mem., ECF No. [92].

[2]  The Court shall cite only to Defendants' Statement of Material Facts ("Defs.' Stmt.") unless a statement is contradicted by the Plaintiff, in which case the Court may cite to Plaintiff's Response to the Statement of Material Facts ("Pl.'s Resp. Stmt."), or directly to the record where appropriate.

| 08:49: | Alpha One to ERT Two, if you deploy that gas and we are not prepared for that, we are not prepared to [inaudible] just yet, please standby for just five more minutes. |

| 09:00: | [ERT Two] Copy, I just need communication from you because I'm getting, ah, issues down here.  I just need you to keep me informed so I can inform them because, I'm getting - pressured. |

| 09:13: | [Alpha One] I understand ERT Two, 'cause I'm trying to put a couple of things in place here.  If you can give me a couple of minutes, I'll be happy to brief you. |

***

| 09:40: | Alpha One to ERT Two, would you let command know that we have been in contact with him again, and if they will please just give us a couple of minutes, I'm gonna try to resolve this . . . |

| 09:50: | [ERT Two] . . . I'll advise. |

***

| 10:17: | [Delta One replies to Charlie One] . . . also can you advise ERT One, Two, the Command and the Chief they're in a, ah, bad situation.  I can see 'em from the front door here.  So, if anything happens, they in the line of fire. |

| 10:37: | [Charlie One] I'll tell them to move out the way . . . |

Pl.'s Ex. 26 (10/1/2010 PERB Hearing Examiner's Report & Recomm.) at 10.  The incident was resolved shortly thereafter without deploying tear gas.  *Id.*

The following Monday, Officer Wendell Cunningham—a member of the ERT and Vice Chairman of the FOP, Pl.'s Ex. 26 at 9—contacted the Plaintiff to discuss concerns raised regarding the incident.  *See*, *e.g.*, Pl.'s Ex. 2 (1/25/10 PERB Tr.) at 361:21-362:1.  The Plaintiff instructed Officer Cunningham to initiate an FOP Safety Committee investigation into the incident.  *Id.* at 175:5-8 ("I told [the Plaintiff] I think we need to activate the Safety Committee on the situation.  And he told me, just go ahead and do what I have to do in reference to that.  And I went ahead."); Defs.' Stmt. at ¶¶ 21, 23.  Officer Cunningham is not a member of the FOP

Safety Committee, but as Vice-Chairman of the FOP, he is responsible for all FOP committees. Pl.'s Ex. 20 (IAB Invest. Report) at 11.   Officer Kevin Brittingham chairs the FOP Safety Committee, with Officer Hiram Rosario serving as the co-chair.  Pl.'s Ex. 3 (Baumann Dep. Tr.) at 100:1-10.

At the Plaintiff's instruction, Officer Cunningham requested a copy of the transmission "over the ERT channel" during the incident for purposes of "incident review."  Defs.' Ex. H (6/3/2009 Email W. Cunningham MPD Transcriptions).    MPD released a copy of the transmission to Officer Cunningham on June 5, 2009, at which time he signed an acknowledgment that "[i]t is understood[,] the following recordings are for internal investigation only[,] there are no public requests for any of these incidents and the recordings will not be released to the public without prior, written approval from the Office of Unified Communications."  Defs.' Ex. I (Documentation Receipt).  On June 5, 2009, Plaintiff released a portion of the MPD radio transmissions recorded during the incident to the media.  Pl.'s Resp. Stmt. ¶ 60.  The following day, the Internal Affairs Bureau of the MPD opened an investigation into the release of the recording to the media, initially alleging that Officer Cunningham released the transmission to the media.  Def.'s Ex. K (6/6/2009 Incident Summary Sheet); *see also* Defs.' Stmt. ¶ 35; Pl.'s Resp. Stmt. ¶ 35.

### B.    *All Hands on Deck Arbitration & Internal Affairs Investigation*

In 2007, Chief Lanier launched the "All Hands on Deck" initiative.  Defs.' Ex. B (Gary Reals, *DC Police Launch 4th Installment of 'All Hands On Deck'*, wusa9.com, Oct. 30, 2007). On January 7, 2009, Chief Lanier announced the policy would continue during the 2009 calendar year and indicated that on eight specified three-day weekends and all MPD members would work 8-hour tours of duty on the listed dates.  Defs.' Ex. C (9/9/2009 Opin. & Award) at 6.  MPD

members would not be scheduled for days off on the dates at issue, and leave would be restricted for the dates unless approved prior to January 7, 2009. *Id.* The Plaintiff was critical of the initiative, Defs.' Ex. B, and the FOP challenged the continuation of the policy into 2009 in arbitration, *see generally* Defs.' Ex. C. The Plaintiff testified as a witness on behalf of the FOP as part of the arbitration. *Id.* at 7-11; Defs.' Stmt. ¶ 4. During a break in his testimony, Plaintiff received an email from Lieutenant Welch with Internal Affairs requesting "a date and time at your earliest convenience" for an interview "concerning an administrative investigation." Defs.' Ex. D (6/17/2009 Email D. Welch to K. Baumann). Plaintiff did not respond directly to the email, Defs.' Stmt. ¶ 8, and instead emailed Michael Viehmeyer, the acting Director of the Labor and Employee Relations Unit within the Office of General Counsel, inquiring if the Plaintiff was the subject of the investigation and whether the email was directed to the Plaintiff in his capacity as FOP Chairman, Pl.'s Ex. 11 (6/17/2009 Email K. Baumann to M. Viehmeyer) at 1. Mr. Viehmeyer responded that same day indicating that he "ha[d] no idea what this is regarding, but [would] check." Pl.'s Ex. 12 at 1.

The following day, June 18, 2009, Plaintiff spoke at a Ward 5 community meeting. Lieutenant Ronald Wilkins attended the meeting at the request of MPD, purportedly to "monitor" Plaintiff's speech. Defs.' Stmt. ¶ 41; Pl.'s Resp. Stmt. ¶ 42. That same evening, Plaintiff received an email from Lieutenant Paul Alex Charity instructing Plaintiff to attend an interview with Internal Affairs on June 19, 2009. Pl.'s Ex. 13. Internal Affairs subsequently interviewed Plaintiff on June 19, 2009 and July 14, 2009. Defs.' Stmt. ¶ 37.

As a result of his investigation, Lieutenant Welch concluded (in relevant part), that the Plaintiff provided the transmission to the media "without receiving proper authorization," and the information "was provided to the media as a means to discredit Officials of the Department,

and discredit the Department as a whole." Pl.'s Ex. 20 at 28-29. On December 20, 2009, MPD issued a Final Notice of Adverse Action, citing the Defendant for violating MPD General Order 204.1, Part VI-C-1 & 7 by releasing the audio transmissions to the media without "the prior written approval from the Office of Unified Communications" or MPD. Pl.'s Ex. 22 (Final Notice of Adverse Action) ¶ 3 (referencing Pl.'s Ex. 21 (Notice of Proposed Adverse Action) at 1). The Plaintiff was also cited for violating MPD General Order 120.21 by releasing the transmission before initiating an investigation in his role as Chairman or notifying Internal Affairs of any alleged dangerous behavior. *Id.* (referencing Pl.'s Ex. 21 at 2).

       C.     *Present Litigation and Revocation of the Plaintiff's Police Powers*

The Plaintiff filed his initial Complaint accompanied by a motion for preliminary injunction with this Court on June 29, 2009. Compl., ECF No. [1], Mot. for Prelim. Inj., ECF No. [4]. The Court denied Plaintiff's request for preliminary injunctive relief on July 11, 2009. 7/11/2009 Order & Mem. Opin., ECF Nos. [12, 13].

Two days later, MPD revoked Plaintiff's police powers, confiscated his weapon and badge, and placed him on non-contact status, allegedly for failing to complete CPR, automated external defibrillation, and extendable baton training for 2008. Pl.'s Resp. Stmt. ¶ 79; Defs.' Ex. F (7/6/2009 Incident Summ. as to K. Baumann); *see also* Pl.'s Ex. 29 at 9 (defining non-contact status). For the sake of brevity, the Court refers to all of the actions taken against the Plaintiff in connection with the training issue collectively as the revocation of his police powers. Delroy Burton, another FOP official, likewise had his police powers revoked for failing to attend the required 2008 extendable baton and CPR training. Defs.' Ex. G (7/6/2009 Incident Summ. as to D. Burton). On appeal, Chief Lanier dismissed the second violation, and reduced the Plaintiff's suspension (without pay) from five days to three days. Pl.'s Ex. 23 (2/5/10 Ltr C. Lanier to K.

Baumann) at 7.

        D.        *2011 Traffic Stop Investigation*

On May 6, 2011, Celia Taylor with the Washington Regional Threat and Analysis Center, operated by MPD, observed the Plaintiff stop a vehicle while driving "a black Dodge Charger with District of Columbia license plates, and equipped with emergency response police equipment." Defs.' Ex. N (7/19/2011 Final Invest. Report) at 1. Ms. Taylor mentioned the incident to her supervisor Tom Wilkins during a conversation on or about May 16, 2011. *Id.* Mr. Wilkins in turn mentioned the incident to Assistant Chief of the Internal Affairs Bureau Michael Anzallo during a meeting regarding an unrelated matter. *Id.* Assistant Chief Anzallo asked Mr. Wilkins to instruct Ms. Taylor to record her observations in writing. *Id.* Ms. Taylor composed an email recounting her observations, which she forwarded to Mr. Wilkins, who subsequently forwarded the email to Assistant Chief Anzallo and Mark Viehmeyer. *Id.* Assistant Chief Anzallo further instructed his administrative Lieutenant to assign the matter to the LERU for investigation. *Id.* On May 25, 2011, Lieutenant Linda Nischan was directed to investigate the matter. *Id.* at 2. The Office of the General Counsel contacted the Department of Motor Vehicles and determined that the FOP was authorized to operate the vehicle in question as an "Authorized Emergency Vehicle." *Id.* Accordingly, Lieutenant Nischan concluded the Plaintiff did not violate any District or MPD rules or regulations by performing the traffic stop in the Dodge Charger. *Id.* at 3; Defs.' Stmt. ¶¶ 49, 51.

        E.        *Administrative Proceedings*

In parallel to the district court litigation, on June 29, 2009, the FOP filed several unfair labor practice ("ULP") complaints with the Public Employees Review Board ("PERB"), including:

(1)     PERB Case No. 09-U-4: Alleging "Respondents committed ULPs by interfering, intimidating and retaliating against [Baumann] while he was testifying in his representational capacity at an arbitration challenging MPD's All Hands On Deck Initiative.  Pl.'s Ex. 26 at 2-3.  This complaint was later amended to allege the 3-day suspension imposed on Baumann purportedly for releasing the recording to the media was an unfair labor practice.  *Id*. at 3.

(2)     PERB Case No. 09-U-42: Alleging that "as a result of Welch's e-mail to Baumann to report to IAB for an administrative investigation, the MPD committed ULPs by compelling Baumann to respond to questions . . . regarding protected union activities."  *Id*.

(3)     PERB Case No. 09-U-43: Alleging that "MPD committed ULPs by interfering, restraining, intimidating and retaliating against Baumann" while testifying at the AHOD hearing insofar as Baumann received an email from Lieutenant Welch regarding the Internal Affairs interview during a break in his testimony.  *Id*.

(4)     PERB Case No. 09-U-44: Alleging MPD committed ULPs against Baumann by sending the June 18, 2009 email instructing Baumann to attend the Internal Affairs interview the following day, and by threatening Baumann with discipline if he did not answer the questions posed during the interview.  *Id*. at 4.

The PERB held hearings on the various complaints across nine days in January and February 2010.  *Id*. at 5.  The Hearing Examiner found that because "there was no confidential tactical information on the ERT radio communications recording," the MPD lacked a legitimate reason to discipline the Plaintiff, and therefore concluded that "MPD disciplined Baumann in retaliation for the protected activity of releasing the ERT radio communications to the news media."  Pl.'s Ex. 26 at 28-30.  However, the Hearing Examiner dismissed the Plaintiff's claims that the emails to the Plaintiff from Internal Affairs requesting an interview and the first Internal Affairs interview constituted unfair labor practices.  *Id.* at 31-35.  With respect to the email, the Hearing Examiner held that "FOP's assertions regarding Welch's motives for sending the e-mail to Baumann to schedule an IAB interview are vague, speculative and nothing more than inferences without support in the record," and "there is no material evidence to support a finding that Welch knew Baumann was testifying at the AHOD arbitration or that Baumann had a

BlackBerry or that Baumann would check his e-mails at that time." *Id.* at 35.  In terms of the Plaintiff's initial Internal Affairs interview, the Hearing Examiner conclude that "[f]or his part, Welch accepted Baumann's refusal to answer questions.  Therefore, this record establishes that IAB did not engage in any conduct which violated FOP and Baumann's assertion of a labor relations privilege based on Baumann's representational role as FOP Chairman." *Id.* at 33.

The Plaintiff separately filed a complaint relating to MPD's revocation of his police powers.  *See generally* Pl.'s Ex. 29 (9/25/2010 PERB Hearing Examiner's Report & Recomm.).  Noting the history of animosity between the Plaintiff and the Assistant Chief responsible for revoking the Plaintiff's police powers, the Hearing Examiner explained that "[b]ased on the record as a whole, it is fair to conclude that the predominant motive for the Respondents' unprecedented and unilateral actions in its treatment of the Union officials; that is, to retaliate for their assertive activism on behalf of the FOP and its members." *Id.* at 28.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).   When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248.   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.   For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id*.   The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.   "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).   The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## III. DISCUSSION

The Defendant moves for summary judgment as to all claims in the Third Amended

Complaint, on several grounds.  The Plaintiff did not cross-move for summary judgment on any issues.  The Court begins by addressing the Defendant's contention that the Comprehensive Merit Personnel Act pre-empts the Plaintiff's causes of action, giving the PERB exclusive jurisdiction over the claims at issue.  The Court then examines the Plaintiff's claims under the Whistleblower Protection Act and his First Amendment retaliation claims.  Finally, the Court briefly turns to the Plaintiff's assertion that MPD General Order 204.01 is an unlawful prior restraint.[3]

A.       *Preemption by the Comprehensive Merit Personnel Act*

Initially, the Defendants argue that the PERB has exclusive jurisdiction over the Plaintiff's claims.  Defs.' Mot. at 20-21.  The Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.01 *et seq*., established the PERB, which decides "whether unfair labor practices have been committed and issue [] appropriate remedial order[s]."  D.C. Code §§ 1-605.01, 605.02(3).  The District of Columbia Court of Appeals has found that various types of claims against an employer are pre-empted by the administrative remedies provided by the CMPA.  *District of Columbia v. Thompson*, 593 A.2d 621, 625 (D.C. 1991) (finding the CMPA precluded a District employee from filing suit for defamation and emotional distress claims arising out of written evaluation by plaintiff's supervisor); *see also Lewis v. D.C. Dep't of Motor Vehicles*, 987 A.2d 1134 (D.C. 2010); *Wilson v. District of Columbia*, 608 A.2d 161 (D.C. 1992) (extending Thompson to breach of contract claims).

The Defendants do not specifically address pre-emption of the Whistleblower Protection

---

[3]      At various points in his opposition, the Plaintiff emphasizes that the Defendants did contest certain elements of the Plaintiff's claims in their motion for summary judgment.  *E.g.*, Pl.'s Opp'n at 27.  Because the Plaintiff did not cross-move for summary judgment as to any portion of his claims, the Court makes no findings as to issues the Defendants did not raise in their motion.

Act claims in their initial motion, nor do they respond to the Plaintiff's argument on this issue. Therefore, the Court assumes the Defendants are not pursuing their pre-emption claim with respect to the Plaintiff's state law claim. To the extent this argument has been raised, for the reasons stated by Judge Gladys Kessler in *Sharma v. District of Columbia*, 791 F. Supp. 2d 207 (D.D.C. 2011), the Court finds the CMPA does not pre-empt the Plaintiff's Whistleblower Protection Act claims. *Id.* at 216-17 (noting the act specifically provides for both judicial *and* administrative remedies).

The CMPA does not foreclose this Court from entertaining claims over which it has original jurisdiction, including constitutional claims brought under 42 U.S.C. § 1983. *Deschamps v. District of Columbia*, 582 F. Supp. 2d 14, 16 (D.D.C. 2008); *see Lightfoot v. District of Columbia*, 448 F.3d 392, 399 (D.C. Cir. 2006) (noting that even where the judicial review provision of a local statute "places exclusive jurisdiction in the D.C. Court of Appeals," "that does not mean that a federal court lacks authority to entertain a claim under § 1983 that would also be cognizable" as a claim under the local statute). "Mere invocation" of the Constitution may be insufficient as the Defendants suggest, but in cases such as this, where the plaintiff states a constitutional claim and seeks relief not available through the administrative process—i.e., compensatory and punitive damages—the CMPA does not deprive this Court of jurisdiction over the Plaintiff's constitutional claim. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 69 (D.D.C. 2007); *accord Owens v. District of Columbia*, --- F.3d ---, 2013 WL 563425, at *5 (D.D.C. Feb. 14, 2013). Having established the Court has jurisdiction, the Court turns to the claims alleged in the Third Amended Complaint.

   B.   *Whistleblower Protection Act Claims*

The District of Columbia Whistleblower Protection Act prohibits any "supervisor" from

12

threatening to take or taking a prohibited personnel action or otherwise retaliating against an employee because of the employee's "protected disclosure."   D.C. Code § 1–615.53.   A "protected disclosure" is defined as:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> > (A) Gross mismanagement;
> >
> > (B) Gross misuse or waste of public resources or funds;
> >
> > (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
> >
> > (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
> >
> > (E) A substantial and specific danger to the public health and safety.

*Id.* at § 1–615.52(a)(6).   "A 'protected disclosure' under the [statute] is one that the employee 'reasonably believes' evidences one or more of the circumstances delineated in D.C. Code § 1–615.52(6)(A)-(E) (2001)."   *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008). The "'employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'"   *Id.* (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)).

A "public body" for purposes of the Whistleblower Protection Act includes "[a]ny federal, District of Columbia, state, or local law enforcement agency, prosecutorial office, or police or peace officer." *Id.* at § 1–615.52(a)(7)(D).   A "supervisor" is

> an individual employed by the District government who meets the definition of a "supervisor" in § 1-617.01(d) or who has the authority to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources that an employee may allege

or report pursuant to this section, including without limitation an agency head, department director, or manager.

D.C. Code § 1–615.52(a)(8).[4]

The Defendants move for summary judgment on the grounds the Plaintiff failed to make a protected disclosure under the Whistleblower Protection Act.   In response, the Plaintiff identifies several discrete "protected disclosures" as the basis for this claim: (a) Plaintiff's referral of the barricade situation to the Safety Committee(s); (b) Plaintiff's testimony before the Arbitrator regarding the All Hands on Deck initiative; (c) Plaintiff's June 11, 2009 email to his supervisors regarding the barricade situation; and (d) Plaintiff's interviews with Internal Affairs. The Court examines each purported protected disclosure separately.

### 1.   Referral of the Barricade Situation to the Safety Committee(s)

Plaintiff initially bases his whistleblower claim on his referral of the barricade situation to the Safety Committee(s).   In his opposition, the Plaintiff specifically argues this "referral" encompassed three separate protected disclosures: to Officer Cunningham, to the FOP Safety Committee, and to the Joint Safety Committee.   As set forth below, none of these purported disclosures fall within the scope of the Whistleblower Protection Act.

#### a.   *Referral to Officer Cunningham*

Plaintiff asserts that "Officer Wendell Cunningham is a police officer and therefore the protected disclosure made to Officer Cunningham was a protected disclosure to a public body." Pl.'s Opp'n at 22.   With this argument, the Plaintiff attempts to have his cake and eat it too.   The

---

[4]   Section 1-617.01(d) of the D.C. Code provides a "supervisor" means "an employee having authority, in the interest of an agency, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to evaluate their performance, or to adjust their grievances, or effectively to recommend such action," if the exercise of this authority "is not of a merely routine or clerical nature, but requires the use of independent judgment."

Plaintiff consistently characterized his own conduct and Officer Cunningham's conduct as being performed as representatives of the FOP, yet now argues Officer Cunningham was not serving as a union official during the relevant time period. Throughout the IAB investigation and his pleadings, Plaintiff referred to Officer Cunningham in his capacity as Vice Chairman of the FOP when discussing the FOP Safety Committee investigation. *E.g.*, Pl.'s Opp'n at 13 ("[D]uring the interview, the Plaintiff disclosed to Lieutenant Welch that 'quite a few people had raised concerns' about the barricade incident and that as a result, he instructed *Vice Chairman* Cunningham to investigate the barricade situation.") (emphasis added); *id*. at 89 (*Vice Chairman* Cunningham, not Chairman Baumann, obtained the recording of the barricade for purposes of the safety investigation.") (emphasis added); Pl.'s Ex. 18 at 17 ("Any communications I had with . . . *Vice Chairman* Cunningham would be in my role as chairman.") (emphasis added). Officer Cunningham's own testimony to Internal Affairs reflected his understanding that he was acting in his capacity as a union official in investigating the barricade situation. Pl.'s Ex. 20 at 20 ("[Officer Cunningham] maintained that he retained the right, as a Union official, to discuss the matter with the Union Chairman."). Plaintiff's initiation of the FOP Safety Committee investigation was undoubtedly communicated to Officer Cunningham while both individuals were operating in their capacities as FOP officials. The Plaintiff offers no authority for the proposition that a disclosure made to a union official acting in that capacity, but technically also a police officer, qualifies as a protected disclosure under the statute. Officer Cunningham did not receive the disclosure in his capacity as a police officer, therefore the disclosure was not to a "public body" as defined by the Whistleblower Protection Act.

Alternatively, the record establishes that the Plaintiff did not make any protected disclosure to Officer Cunningham at the time he instructed Officer Cunningham to initiate the

FOP Safety Committee investigation.  Officer Cunningham was present at the barricade, and overheard the relevant communications.  Pl.'s Ex. 2 at 367:10-13.  It was Officer Cunningham who approached the Plaintiff following the incident, and expressed his concerns regarding the incident.  *Id.* at 361:21-362:1.  The Plaintiff does not identify any information the Plaintiff disclosed to Officer Cunningham that might qualify as a protected disclosure under the Whistleblower Protect Act.

> b.        *Referral to the FOP Safety Committee*

The Plaintiff also contends that his instruction to Officer Cunningham to initiate the FOP Safety Committee investigation was in effect a protected disclosure to the FOP Safety Committee itself.  Ignoring the fact that Officer Cunningham is not a member of the FOP Safety Committee, the Plaintiff propounds that the FOP Safety Committee is a "supervisor" for purposes of the Whistleblower Protection Act because it is "a properly sanctioned committee that addresses safety issues directly with high level command officials in the MPD, and therefore has the authority to effectively recommend or take remedial or corrective action for the barricade safety concerns."  Pl.'s Opp'n at 22.[5]  It is not \clear from the record that the FOP Safety Committee has sufficient authority to be considered a "supervisor" under the act.  *See* Pl.'s Ex. 2 (1/25/2010 PERB Tr.) at 214:7-14 (indicating the committee "tr[ies] to address" safety issues brought to its attention by contacting the relevant bureau head "to see if we can come to – you know, to rectify the problem or work in a direction to – you know, to take care of the problem").  Assuming the Plaintiff's characterization of the FOP Safety Committee is accurate, the committee still fails to meet the WPA definition of a supervisor because it is not "an individual

---

[5]   The Plaintiff does not argue that the FOP Safety Committee is a "public body" for purposes of the Whistleblower Protection Act.  Pl.'s Opp'n at 22.

employed by the District government." The FOP Safety Committee is neither an individual nor is it employed by the District of Columbia. Therefore, Plaintiff's referral of the barricade situation to the FOP Safety Committee was not a "protected disclosure."

> c.  *Referral to the Joint Safety Committee*

Plaintiff further argues that his instruction to Officer Cunningham to initiate the FOP Safety Committee Investigation amounted to a protected disclosure to the Joint Safety Committee which, in Plaintiff's view, "likely" is a "public body" under the Whistleblower Protection Act. Pl.'s Opp'n at 21-22. Curiously, the Plaintiff does not in fact argue the Joint Safety Committee is a public body, instead speculating that it "likely" can be characterized as such. In any event, the Court need not reach this issue because the record reveals the barricade issue never reached the Joint Safety Committee. Officer Cunningham testified before the PERB that the Joint Safety Committee has never convened. Pl.'s Ex. 2 (1/25/10 PERB Tr.) at 391:12-392:9; *see also id.* (Test. of Chief Lanier) at 1318:20-1319:19 ("I'm not familiar with there ever being [a Joint Safety Committee] since I've been the Chief."). The FOP, per Officer Cunningham, had never designated the FOP representatives for the Joint Safety Committee. *Id.* at 394:10-15 (W. Cunningham); *accord id.* at 1321:17-1322:12. The Plaintiff acknowledged the Joint Safety Committee did not exist at that time, but suggests that "the FOP Safety Committee has become the de facto Joint Safety Committee." *Id.* at 1525:22-1526:1; *accord* Def.'s Ex. A (Baumann Dep.) at 95:1-6 ("I made a referral to our—and by our, I mean the FOP safety committee, which is the—is operated as the joint safety committee for the department under our contract. The department has a—hadn't had anybody on it for some time."). To the extent the FOP Safety Committee operates as the "Joint Safety Committee," the Plaintiff fails to articulate how a committee comprised entirely of union officials is an "instrumentality" of the MPD. *See*

D.C. Code § 1-615.32(a)(7)(C).  Thus, any disclosure to the "Joint Safety Committee" was not a protected disclosure under the Whistleblower Protection Act.  Having failed to identify any protected disclosure to a public body or supervisor, Defendants are entitled to summary judgment as to Plaintiff's WPA claim based on Plaintiff's referral of the barricade situation to the safety committee(s).

### 2.   Plaintiff's Testimony Regarding the All Hands on Deck Initiative

The Plaintiff identifies his second "protected disclosure" as his testimony before the arbitrator charged with evaluating the FOP's grievances regarding the All Hands on Deck initiative.  The Defendants contend that Plaintiff's testimony did not amount to a protected disclosure because Plaintiff simply added to the ongoing public debate on the initiative.  In *Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010), the D.C. Court of Appeals confirmed what it had previously implied: a disclosure is not protected if the facts alleged are "public knowledge" and there has been "vocalized public concern about the very information that [plaintiff] conveyed." *Id*. at 489.  To be fair, the court stopped short of limiting protected disclosures to "instances in which no one in the general public is aware of the abuse." *Id.*

Applying *Williams*, District Judge James E. Boasberg determined a MPD Officer's interview with the Washington Post about the All Hands on Deck initiative was not a protected disclosure.  *Hawkins v. Boone*, 786 F. Supp. 2d 328, 334 (D.D.C. 2011).  In rejecting the plaintiff's whistleblower claim, Judge Boasberg noted "Hawkins was entering a debate about a controversial issue long discussed by both sides.  Just as in *Williams*, members of the public and the press had 'themselves perceived an alleged abuse, and already vociferously and repeatedly draw[n] attention' to the AHOD policy long before Hawkins entered the debate." *Id*. (quoting *Williams*, 9 A.3d at 490).

18

In this case, the Plaintiff alleges his testimony before the arbitrator was "not simply adding to the public debate, but was providing specific information regarding the MPD's statutory and regulatory violations that had not previously been made public." Pl.'s Opp'n at 24. Despite general assertions that the information provided by the Plaintiff was "new," nowhere in his opposition does the Plaintiff identify any *specific* statements or disclosures to the arbitrator that were not duplicative of information already within the realm of public knowledge. Furthermore, the arbitrator's summary of the Plaintiff's testimony indicates the Plaintiff primarily offered *legal analysis* rather than factual testimony. Defs.' Ex. C (9/6/2009 Opin. & Award) at 8-11. The summary reflects the fact that the Plaintiff authenticated various documents, including prior FOP challenges to the All Hands on Deck initiative, and testified as to why he believed the policy violated various provisions of the Collective Bargaining Agreement. At no point in his opposition does the Plaintiff claim that any of the factual information provided in his testimony—namely the details of the initiative, including the limitation on vacation time during the summer—was "new" information. In other words, the Plaintiff's testimony may have offered new legal *analysis* of the facts well-established in the public debate, but there is nothing in the record to suggest the Plaintiff offered any new information *evidencing* a violation of local law as required for a protected disclosure under the Whistleblower Protection Act. D.C. Code § 1-615.53; *see Williams v. Johnson*, 701 F. Supp. 2d 1, 15 (D.D.C. 2010).

       3.    <u>Plaintiff's June 11, 2009 Email to His Supervisors</u>

Plaintiff's third purported "protected disclosure" occurred in his June 11, 2009 email to his supervisors regarding their handling of the barricade situation. Plaintiff contends his email "disclosed a violation of law as well as a substantial and specific danger to public health and

safety." Pl.'s Opp'n at 25. The text of the email reveals otherwise. The relevant exchange of emails began with Officer Kevin Brittingham contacting Assistant Chief Alfred Durham and Assistant Chief Patrick Burke on June 10, 2009. Pl.'s Ex. 8 at 4 (6/10/2009 Email K. Brittingham to A. Durham, P. Burke, J. Crane, J. Herold, S. Dignan, R. Chambers, & C. Yarbaugh). Officer Brittingham's email stated that "[i]t has been brought to my attention that there are some safety concerns regarding barricades. It was noted that the barricades could potentially result in deaths of citizens and/or officers." Pl.'s Ex. 8 at 4. He thus asked "[w]ould it be possible to schedule a meeting with all parties (copied on this message) to discuss this further?" *Id.*

Chief Burke responded by indicating he would be happy to set up a meeting and would select a date for the meeting the following day. *Id.* Officer Charles Yarbaugh, who was copied on the initial exchange, asked Officer Brittingham to meet with the "rank and file members" of the ERT before requesting a meeting with Chief Durham and Chief Burke. *Id.* Officer Yarbaugh indicated the failure to meet with ERT team members before meeting with management led to "unfavorable decisions," that have "adversely affected the original way ERT was structured to operate." *Id.*

Chief Burke replied to Officer Yarbaugh's email by making Captain Jeffrey Harold the "point of contact," and stating that "when the union coordinates their actions on this matter please let me know how you wish to proceed." Pl.'s Ex. 8 at 3. An unidentified person forwarded the email exchange to Plaintiff, who then forwarded the chain to Chief Durham and stated:

> As you can see from the email chain, Chief Burke has asserted that the union has failed to "coordinate" its actions and indicated that FOP Joint Safety Committee requests must be made through the "chain of command."

As demonstrated by the email chain, Chief Burke's assertions are based on matters raised by Sergeant Yarbaugh of the Emergency Response Team.  As the Department is well aware from the FOP's past Article 9 notifications, Sergeant Yarbaugh holds no elected or appointed office in the FOP and does not speak for the FOP or any of its members.  Sergeant Yarbaugh's assertion that he speaks for undisclosed and unnamed members of the bargaining unit makes Sergeant Yarbaugh a representative of a rival organization.  Chief Burke's decision to defer to or even consider Sergeant Yarbaugh's request constitutes not only the recognition of a rival organization, but also bargaining with representatives not selected by members of the bargaining unit. That action is expressly prohibited by the Agreement and D.C. Code, and the FOP has specifically warned the Department about its failure to properly respect the rights of the FOP and the scope of its responsibilities under the D.C. Code.

Further, Chief Burke's failure to recognize the legitimacy of the FOP Safety Committee's request (i.e., "when the union coordinates their actions") and to make a first time ever assertion that the Committee is now subject to the "chain of command," violates what is commonly referred to as the equality rule and represents a repudiation of the Agreement in general and Article 17 specifically. The Department has been properly (and repeatedly) notified under Article 9 of who the FOP's designated representatives are, including the chair of the Joint Safety Committee, Kevin Brittingham.  The Department's decision to deny a legitimate and proper request from the FOP is unacceptable. The decision to do so based on objections and interference from an individual that is not designated or elected to represent the members of the bargaining unit is a violation of the law.

Any efforts by Captain Jeffery Herold to "handle" this matter will be viewed as further interference with our members' right to bargain through representatives of their own choosing.

Please accept this as yet another notification that your administration has failed to live up to its obligations under the Agreement and D.C. law. The matter will be referred to the Public Employees Relations Board as an unfair labor practice.

Pl.'s Ex. 8 at 1-2 (6/11/2009 Email K. Baumann to A. Durham, M. Viehmeyer, W. Cunningham,

K. Brittingham, P. Burke, & D. Burton).

Nothing in Plaintiff's email could reasonably be construed to convey a "substantial and

specific danger to public health and safety."  In fact, the only discussion of safety issues in the

entire chain of emails occurred in Officer Brittingham's initial email to Assistant Chiefs Durham

and Burke.  The only basis on which Plaintiff's email might be considered a protected disclosure

is under Section 1-615.52(a)(6)(D), which concerns disclosures of violations of "a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature."  The operative question is whether the email disclosed "such serious errors" by the MPD management "not debatable among reasonable people."  *Wilburn*, 957 A.2d at 925.

The Court finds no reasonable jury could conclude Plaintiff disclosed more than a minimal violation of D.C. law.  Neither in the email nor in his opposition does Plaintiff identify what sections of the D.C. Code were purportedly violated by Chief Burke.[6]  Reasonable people could certainly debate whether Chief Burke's response constituted recognition of a "rival organization," or simply removed himself from an internal discussion amongst union members as to how to proceed.  To the extent Chief Burke's response was a violation of D.C. law, Plaintiff provides no basis in the record—or even argument in his opposition—on which the Court could conclude that the error was "serious."  The vague and conclusory statements in the email in question, which Plaintiff does not attempt to clarify, do not amount to a "protected disclosure" for purposes of the Whistleblower Protection Act.

### 4.    Plaintiff's Interviews with Internal Affairs

Plaintiff finally asserts that certain statements made during his interviews with Lieutenant Welch from Internal Affairs amounted to protected disclosures.  The Plaintiff claims his statements to Lieutenant Welch were new, protected disclosures because "[Welch] clearly did not know about Plaintiff's safety concerns regarding the barricade incident as well as the fact that several MPD members had alerted the Plaintiff of these safety concerns," as reflected by the

---

[6]  The Plaintiff does not contend that, and the Court does not consider whether, violations of a collective bargaining agreement fall within the scope of D.C. Code § 1-615.513(D).

subsequent decision to "broaden[] of the scope of the investigation."  Pl.'s Opp'n at 26.

During Plaintiff's first interview on June 19, 2009, the Plaintiff refused to answer any questions regarding the barricade situation.  *See generally* Pl.'s Ex. 18 (6/19/09 IAB Tr.).  Plaintiff and his FOP representative spent most of the interview arguing with Lieutenant Welch regarding the way in which Plaintiff was contacted to set up the interview.  *Id*. at 1-17.  Once Lieutenant Welch began to ask substantive questions, Plaintiff refused to answer any of the inquiries, asserting they fell within the scope of Plaintiff's role as Chairman of the FOP.  *Id*. at 17-18.  The Plaintiff flatly refused to discuss anything relating to the barricade situation, and did not disclose any "safety concerns" to Lieutenant Welch.

Plaintiff's second interview followed a similar course.  *See generally* Pl.'s Ex. 19 (7/14/09 IAB Tr.).  Plaintiff repeated his objections to the method of contact and initially refused to answer any questions regarding the specifics of the FOP Safety Committee's investigation, including whether Plaintiff ever listened to the recording of the barricade incident.  *Id.* at 1-15.  When asked if he believed any misconduct occurred during the barricade situation, and what he was told in reference to the situation, Plaintiff responded

> The, from what I was, from what I was told initially, I believe once I heard, one of the reasons I asked the Safety Committee I believe that there'd been safety violations that had occurred.

> I heard several things, . . . I was told that we had an armed gunman in the house, that the gas, teargas was ordered to be used, and that there was a great deal of confusion, a lot of concerns by members of the ERT.

*Id*. at 17.  Plaintiff explained that he did not believe what occurred at the barricade to be "serious misconduct."  *Id*.  When Lieutenant Welch specifically inquired as to whether the use of tear gas at the barricade was excessive force, the Plaintiff explained "[I] had heard that the order was given. I didn't know what the instance was.  That's why we asked for the Safety Committee to

investigate." *Id.*

After much back and forth regarding Plaintiff's refusal to answer questions concerning acts the Plaintiff purported took in his "representational capacity," Pl.'s Ex. 19 at 19-25, Plaintiff admitted he disclosed the audio recording to the media, *id.* at 16.   The only portion of the Plaintiff's responses that can be construed as addressing safety concerns reads, in relevant part, as follows:

> [T]he matter was brought to me as I've told you.  People were very concerned that someone was going to get hurt or killed, not, at that one or at the next one, they started talking about the barricade, from ERT.  One of my initial issues with the barricade, this barricade was the fact that hostage negotiators had come out. They'd been recently disbanded. . . . I, again think that this situation is serious enough and dangerous enough that somebody's going to get hurt. . . . Again, I think this is an enormously serious issue.  So, we, I asked for the Safety Committee to investigate it.  I asked for the Safety Committee to get the tape once it came in.

*Id.* at 25-26; *see also id.* at 28 ("[B]ecause I thought what happened out there was so dangerous, I was trying to get that story run.").

Thus, the record indicates that the only specific safety concern disclosed by Plaintiff during the interview was the fact the hostage negotiators were present at the barricade, despite having recently been disbanded.   Lieutenant Welch was well aware of this fact, having interviewed Sergeant Kevin O'Bryant, the team leader of the hostage negotiators who was present in the command post during the barricade, on June 9, 2009—ten days prior to Plaintiff's first interview.  Pl.'s Ex. 20 (Final Investigative Report) at 5.

Furthermore, the Plaintiff provides no support for the assertion that the Plaintiff disclosed previously unknown information which caused Lieutenant Welch to expand the scope of his investigation.   Lieutenant Welch conducted six interviews after Plaintiff's July 14, 2009 interview: (1) Sergeant Yarbaugh; (2) Officer Brittingham; (3) Officer Hiram Rosario; (4) Ms.

Tammie Creamer; (5) Officer Cunningham; and (6) Assistant Chief Burke. *See generally* Pl.'s Ex. 20. With respect to the four of these individuals, Lieutenant Welch initially interviewed each person *before* the Plaintiff's July 14 interview. *Id.* at 7 (Sgt. Yarbaugh's first interview conducted June 9); *id.* at 23 (Officer Brittingham's first interview conducted on June 23); *id.* at 12 (Ms. Creamer's first interview conducted on June 6); *id.* at 17 (Officer Cunningham's first interview conducted on June 9). Of the four follow-up interviews and two initial interviews conducted after July 14, five were concerned only with the release of the audio transmission and when the FOP Safety Committee initiated its investigation. *Id.* at 8 (Sgt. Yarbaugh); *id.* at 11 (Officer Brittingham); *id.* at 12 (Officer Rosario); *id.* (Ms. Creamer); *id.* at 19-20 (Officer Cunningham). Assistant Chief Burke was also the only individual to be asked questions regarding the barricade incident itself. *Id.* at 17. But, there is nothing in the record to suggest any information disclosed during the Plaintiff's interview led Lieutenant Welch to interview Assistant Chief Burke, ask Assistant Chief Burke questions regarding any particular issue, or inquire as to any safety or security issues with any other witnesses. Ultimately, the Plaintiff failed to identify any information regarding "safety concerns" disclosed during the interview that Lieutenant Welch was not aware of at least a month before Plaintiff's interview.

In sum, the Plaintiff did not make any "protected disclosures" for purposes of the Whistleblower Protection Act. Any disclosure made in the context of initiating the FOP Safety Committee investigation of the barricade incident was not made to a public body or supervisor as defined by the statute. The Plaintiff's arbitration testimony regarding the All Hands on Deck initiative did not disclose any new information evidencing a violation of local law. The Plaintiff's June 19, 2009 email to his supervisors likewise failed to disclose information evidencing more than a minimal violation of local law. Finally, the Plaintiff's interviews with

Internal Affairs did not disclose any new information regarding purported safety concerns.   No reasonable jury could find the Plaintiff made any protected disclosures under the Whistleblower Protection Act, therefore the Defendants are entitled to summary judgment on Count I of the Third Amended Complaint.

C.      *First Amendment Retaliation Claims*

A public employee seeking to make out a claim of First Amendment retaliation must meet a four-factor test: (1) the public employee spoke as a citizen on a matter of public concern; (2) the employee's interest in speaking on matters of public concern outweighed the government's interest in promoting the efficiency of public services; (3) the employee's speech was a substantial or motivating factor in prompting the retaliatory act; and (4) the employee must refute the government's showing, if made, that it would have reached the same decision in the absence of the protected speech.  *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007); *Tao v. Freeh*, 27 F.3d 635, 638–39 (D.C. Cir. 1994).  The Plaintiff identifies four acts allegedly taken in retaliation for his certain protected activities (outlined below): (1) the 2009 investigation into the leak of radio transmission to the media; (2) sending Lieutenant Wilkins to "monitor" the Plaintiff's appearance at the Ward 5 community meeting; (3) revoking the Plaintiff's police powers on July 13, 2009; and (4) the 2011 investigation into the Plaintiff conducting a traffic stop in a private vehicle.  As set forth below, no reasonable jury could find the protected activity identified by the Plaintiff was a substantial or motivating factor in prompting any of these purportedly retaliatory acts.  Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's First Amendment retaliation claim, and the Court need not reach the question of whether the Defendants are entitled to qualified immunity.

1.      2009 Internal Affairs Investigation

Initially, the Plaintiff contends that the 2009 investigation by Internal Affairs into the release of the radio transmission from the barricade situation to the media "was undertaken purely as retaliation for Chairman Baumann's criticisms of departmental policies." Pl.'s Opp'n at 28. The Defendants argue in essence that the release of the recording was not protected activity under the First Amendment, and in any event the Plaintiff failed to raise a genuine issue of material fact as to the cause of the 2009 investigation. Because no reasonable jury could conclude that any allegedly protected activity by the Plaintiff was a substantial or motivating factor in 2009 investigation, the Court does not reach the question of whether the Plaintiff's release of the tape was itself protected activity.

In his opposition, the Plaintiff identifies four instances in which he claims he engaged in protected First Amendment activity:

> (1) his request that the union's Safety Committee investigate the barricade situation in which an order was made for the deployment of teargas and his communication to the press regarding this issue;
>
> (2) his testimony regarding the illegality of the Chief's "All Hands on Deck" program, in an arbitration conducted at police headquarters on June 17, 2009;
>
> (3) his speech at a June 18, 2009 meeting of the District of Columbia Ward 5 Republicans concerning general issues related to crime in the District; and
>
> (4) his statements to the press regarding the safety violations at the barricade scene.[7]

Pl.'s Opp'n at 28. The Plaintiff suggests that the "timeline" supports his argument that the 2009 investigation "was retaliation for *all* of Chairman Baumann's protected activities." *Id.* at 29.

---

[7] The Court understands this to mean the Plaintiff's release of the audio tape to the media as there is no other evidence in the record to demonstrate the Plaintiff made separate statements to the press regarding the issue.

The record demonstrates otherwise.

MPD initiated an investigation into the unauthorized release of the radio transmission to the media on June 6, 2009, alleging Officer Cunningham disclosed the recording without proper authorization. Defs.' Ex. K (6/6/2009 Incident Summ.). No reasonable jury could conclude the 2009 investigation was motivated by the Plaintiff's initiation of the FOP Joint Safety Committee investigation of the barricade situation simply because there is no evidence in the record to suggest the Defendants even *knew* about the FOP referral prior to June 6. Moreover, Officer Cunningham did not contact Officer Kevin Brittingham, the Chairman of the FOP Safety Committee, to formally open the FOP investigation until at least June 7, the day *after* Internal Affairs initiated its investigation into the release of the transmission. Pl.'s Ex. 2 at 213:17-18, 284:10-18. Similarly, nothing in the record indicates the Defendants knew the Plaintiff was responsible for leaking the audio transmission until *after* initiating the investigation. To the contrary, MPD initially identified Officer Cunningham as allegedly having released the transmission. Defs.' Ex. K. The undisputed evidence in the record indicates Internal Affairs did not know (1) that the FOP Safety Committee had initiated an investigation into the barricade situation; or (2) that the Plaintiff ever had access to the audio transmission until Officer Cunningham's June 9, 2009 interview with Internal Affairs. Pl.'s Ex. 20 at 18. No reasonable jury could conclude from this record that the 2009 investigation was in retaliation for the Plaintiff's referral of the barricade situation to the FOP Safety Committee or the Plaintiff's release of the audio transmission.

Finally, the Plaintiff's third and fourth incidents of protected speech—his testimony during the All Hands on Deck arbitration and his appearance at the June 18, 2009 Ward 5 community meeting—undeniably took place after the Defendants initiated the 2009 Internal

Affairs investigation. Accordingly, the Plaintiff cannot show a causal link between the investigation and the alleged incidents of protected activity. Ultimately, no reasonable jury could conclude that the Plaintiff's purported protected activity was a substantial or motivating factor in prompting the 2009 Internal Affairs investigation.

2.     Lieutenant Wilkins' "Monitoring" of the Ward 5 Republicans Meeting

The second discrete claim within the Plaintiff's First Amendment claim is that sending Lieutenant Wilkins to "monitor" the Plaintiff's appearance at the Ward 5 Republicans meeting on June 18, 2009 was unlawful retaliation. The Plaintiff makes little attempt to show that sending Lieutenant Wilkins was in retaliation for any of the protected activity identified in the Plaintiff's opposition, except to note that "[t]he MPD 'monitoring' occurred the day after the plaintiff testified against the MPD in the 'All Hands on Deck' arbitration." Pl.'s Opp'n at 36. Considering the record as a whole, no reasonable jury could conclude Lieutenant Wilkins was sent to the meeting in retaliation for the Plaintiff's arbitration testimony.

At some point prior to June 16, an email was sent out over the listserve for the MPD 5th District indicating that the Plaintiff would be speaking during the June 18, 2009 Ward 5 community meeting, hosted by the Ward 5 Republicans. *See* Pl.'s Ex. 15 at 1; Pl.'s Ex. 16 at 2. On June 15, 2009, Diane Groomes emailed Yvonne Smith, both of MPD, asking for a copy of the listserve email and indicating they "[m]ay need to send an MPD rep" to the meeting. Pl.'s Ex. 15. On June 18, Mario Patrizio of MPD sent an email to Ms. Groomes indicating that "Lieutenant Wilkins and Janifer will be there. Just as observers. I gave Lieutenant Wilkins our latest crime numbers which all look good just in case." Pl.'s Ex. 16 at 1. Several days after the meeting, Diane Groomes emailed Mario Patrizio asking for the summary of the meeting. Pl.'s Ex. 17. The record indicates it was not unusual for MPD officers to attend community meetings

at which the Plaintiff spoke.  Defs.' Ex. A (Pl.'s Dep. Tr.) at 230:14-17, 233:2-6.

Nothing in the correspondence prior to the meeting---or anything else in the record---suggests Lieutenant Wilkins was sent to the meeting in retaliation for the Plaintiff's testimony regarding the All Hands on Deck initiative the day before.  In fact, there is no evidence to suggest that the MPD officials involved in sending Lieutenant Wilkins to the Ward 5 meeting were aware of the Plaintiff's involvement in the arbitration, or that they were somehow influenced by individuals within MPD that had such knowledge.  No reasonable jury could conclude from this record that the "monitoring" of the Plaintiff's speech to the Ward 5 Republicans was retaliatory in the manner suggested by the Plaintiff.[8]

### 3.   Revocation of Plaintiff's Police Powers

Third, the Plaintiff argues that the revocation of his police powers on July 13, 2009 was in retaliation for protected activity.  Pl.'s Opp'n at 37.  Notably absent from the Plaintiff's opposition is any claim as to *what* protected activity motivated the purportedly retaliatory action.  Instead, the Plaintiff rests entirely on the PERB Hearing Examiner's finding that "the Respondents failed to present a legitimate reason to justify sanctioning Chairman Baumann . . . for abstaining from in-service training," and "[b]ased on the record as a whole, it is fair to conclude that the predominant motive for the Respondents' unprecedented and unilateral actions . . . [was] to retaliate for their assertive activism on behalf of the FOP and its members."  Pl.'s

---

[8]   The Plaintiff attempts to argue that "[t]he defendants' admitted 'monitoring' of Plaintiff violated his First Amendment rights, as confirmed by D.C. law," citing the Police Investigations Concerning First Amendment Activities Act of 2004, D.C. Code § 5-333.01 *et seq.*  The Court dismissed this claim to the extent the Plaintiff sought compensatory and other damages in a prior memorandum opinion.  *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 226-228 (D.D.C. 2010).  Moreover, even if sending Lieutenant Wilkins to the Ward 5 meeting was not expressly authorized by the act, the Plaintiff fails to articulate (1) why this amounted to a *violation* of the act; or (2) why a violation of the act is *per se* a violation of the First Amendment.

Ex. 29 (Hearing Examiner's Report & Recomm.) at 28.[9]   The Plaintiff conveniently omits why

the Hearing Examiner reached this conclusion.   The relationship between the Plaintiff and

Assistant Chief Robinson, the individual that single-handedly prompted the revocation of

Plaintiff's police powers, is critical to understanding the Hearing Examiner's findings:

> Prior to being elected as the FOP chairman, Officer Baumann served as chief
> steward in the 7th District under Assistant Chief Robinson's command.   Clearly,
> there was no love lost between the two.   Thus, the Chairman testified that he had
> been publicly critical of the Assistant Chief's alleged involvement in a potential
> criminal matter and about a drunken driving arrest.   He also asked that the
> Assistant Chief be called to task before he retired.

*Id.* at 7-8.   With this background, the Hearing Examiner concluded:

> [T]here is a paper trail that documents A.C. Robinson's keen interest in
> pinpointing the Chairman's and Steward's failure to attend training.   On June 30,
> 2009, A. C. Robinson received a list naming 136 officers who had not completed
> training by that date.   Of that number, he cherry-picked only those who had not
> attended ASP/CPR/AED training.   It was not coincidental that only 4 names
> appeared on the short list --Chairman Baumann, Steward Burton and two others
> whose names were mistakenly on the list, but suffered no sanctions when their
> correct status was determined.   On the same day, the A.C. sent a memo to Chief
> Lanier and others advising that those who had not completed that training by July
> 2 would be investigated and have their police powers revoked until they were
> recertified. . . . *Little speculation is required to find the A.C.'s motives for taking*
> *such singular steps in light of the Chairman's outspoken and public criticism of*
> *him.*

*Id.* at 25-26.

The Plaintiff has not alleged that any of the protected activity at issue in this case

involved statements concerning Assistant Chief Robinson or otherwise overlapped with the

union-related activity at issue in the PERB hearing.   Thus, even if the Defendants' did not have a

legitimate reason for revoking the Plaintiff's police powers, the Hearing Examiner's finding

---

[9]   Apart from misconstruing the Hearing Examiner's findings, the Plaintiff's reliance on
the PERB hearing outcome is procedurally problematic in light of the burden-shifting analysis
employed by the Hearing Examiner, which is not applicable to this litigation.   *See* Pl.'s Ex. 29 at
20.

demonstrates the allegedly retaliatory action was not motivated by any of the protected activity at issue in this case.

The Plaintiff also argues that "[t]his retaliatory action which occurred right after the protected activities of Chairman Baumann provides some evidence that suggests an improper, retaliatory motive for the actions."  Pl.'s Opp'n at 38.  Yet again, the Plaintiff fails to identify *what* protected activity occurred "right" before the revocation of his police powers.  To the extent the Plaintiff is referring to the denial of his motion for a temporary restraining order in this case (as his opposition implies), the Court notes that Assistant Chief Robinson issued a memo indicating the Plaintiff and Steward Burton would be subject to action on June 30, 2009—the day after the Plaintiff filed his motion and eleven days before the Court issued its ruling.  Pl.'s Ex. 29 at 26.  Assistant Chief Robinson initiated the process before the Plaintiff filed his Complaint, reflecting the fact that Chief Robinson's was not motivated by this lawsuit.  On this record, no reasonable jury could conclude the Plaintiff's police powers were revoked because of any protected activity at issue in this case.

### 4.    2011 Traffic Stop Investigation

Finally, the Plaintiff asserts that the 2011 investigation into the Plaintiff conducting a traffic stop while driving a private vehicle "is part of a pattern and practice of intimidation and retaliation employed by the Defendants in this matter against the Plaintiff."  Pl.'s Opp'n at 38. Apart from this vague assertion in his pleading, the Plaintiff does not identify any other acts that form part of this "pattern or practice."  Moreover, the Plaintiff concedes the Defendants' argument that the lapse of time between this investigation and the last of the Plaintiff's protected activities does not support an inference of causation.  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit

that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). The 2011 investigation was initiated on May 25, 2011. Defs.' Ex. N (7/19/11 Final Invest. Report) at 1. The last protected activity identified by the Plaintiff in his opposition occurred on June 18, 2009. "Action taken" as here, over twenty-three months later, "suggests, by itself, no causality at all." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

The Plaintiff's causality argument thus rests entirely on the fact that Assistant Chief Anzallo informed Chief Lanier of the investigation during his daily meeting with the Chief. Pl.'s Ex. 25 (Anzallo Dep. Tr.) at 68:22-69:14. The Plaintiff does not argue, and the transcript does not indicate, when this conversation took place. *Id.* at 69:3-7 (indicating Assistant Chief Anzallo mentioned the issue to Chief Lanier "probably after" he receive a copy of Ms. Taylor's email reporting the incident). Furthermore, Assistant Chief Anzallo specifically testified that Chief Lanier did not have any response to Anzallo's comment. *Id.* at 69:8-9. The record does not support the Plaintiff's allegation that Chief Lanier was involved in "making decisions to investigate the Plaintiff" as the Plaintiff alleges. Pl.'s Opp'n at 39. Even if she was involved in the process, the Plaintiff fails to articulate why Chief Lanier's involvement by itself is evidence the investigation was motivated by the protected activity the Plaintiff engaged in nearly two years prior. Based on this record, no reasonable jury could conclude the 2011 investigation was motivated by the protected activity at issue in this case.

> D.     *Validity of General Order 204.1*

Finally, the Plaintiff alleges that MPD General Order 204.1 constitutes an unconstitutional prior restraint as applied to the Plaintiff in this case. MPD charged the Plaintiff

with violating Parts VI-C-1 and 7 of General Order 204.01, which provide that "[c]onfidential information that may jeopardize the successful conclusion of an investigation" cannot be released to the public, and "[a]ll documents not listed as releasable shall be closed to public inspection." MPD alleged the Plaintiff violated this order by releasing the audio transmission to the media "without prior written approval from the Office of Unified Communications" or MPD. Pl.'s Ex. 21 (Notice of Proposed Adverse Act) at 1. The Plaintiff alleges the Order is unconstitutional because it "conditions the exercise of free speech on permission by a police official at the rank of lieutenant or above." Pl.'s Opp'n at 41. The Defendants respond by emphasizing that the Plaintiff fails to explain how the Order gives MPD unbridled discretion, and that the Order on its face applies only when MPD officers "are communicating with the media in an official capacity." Defs.' Reply at 7.

Both parties' arguments miss the mark. First, the restriction on releasing documents "not listed as releasable" is not limited to MPD members acting in their official capacity. Pl.'s Ex. J at 4. The portion of the Order the Defendants cite in their motion is entitled "Guidelines for members participating in format media interviews or as guests on television or radio broadcasts," but does not reference the earlier prohibition on releasing certain documents. *Id.* at 6-7. Second, the Plaintiff improperly relies on the "presumption of invalidity" normally attended to prior restraint claims. Pl.'s Opp'n at 41. "[T]he area of unregulable speech available to public employees is narrower than that available to the public at large, and [] broad clauses [restricting employees' speech] have been upheld in the past." *Nat'l Treasury Employees Union v. Kurtz*, 600 F.2d 984, 987 n.6 (D.C. Cir. 1979). "Restraints on the speech of government employees on matters of public concern are governed by a balancing test":

> [Restraints] are permissible where the government interest in promoting the efficiency of the public services it performs through its employees outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers' views.   Where a restraint is accomplished through a generally applicable statute or regulation, as opposed to a particularized disciplinary action, [the court] must also make sure that the regulation's sweep is reasonably necessary to protect the efficiency of the public service.

*Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (describing the test set

forth in *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466, 474 (1995), and

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).   Because neither party employed the

correct framework to evaluate the Plaintiff's claim, the Court shall deny the Defendants' motion

without prejudice as to the validity of General Order 204.01 and require the parties to submit

further briefing.

The Plaintiff also alleges in his opposition that the Order is unconstitutionally vague and

overbroad.   The Third Amended Complaint does not raise any challenges to the Order apart from

prior restraint, Third Am. Compl. ¶ 54, and the Plaintiff cannot amend his complaint by asserting

new claims in opposition to a dispositive motion.   *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S.*

*Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).   Accordingly, the Court does not reach

these arguments.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds the Defendants are entitled to summary

judgment as to all but one of the Plaintiff's claims.   The Plaintiff's claims are not pre-empted by

the Comprehensive Merit Personnel Act.   However, no reasonable jury could conclude from the

record that the Plaintiff made any protected disclosures for purposes of the District of Columbia

Whistleblower Protection Act.   Furthermore, no reasonably jury could conclude the Plaintiff's

purported protected activities were substantial or motivating factors in prompting any of the

allegedly retaliatory acts the Plaintiff claims violated his First Amendment rights.   Finally, because neither party employed the proper legal framework for evaluating the Plaintiff's prior restraint challenge to MPD General Order 204.01 as applied to the Plaintiff, the Court shall deny summary judgment, but require the parties to submit further briefing.   Accordingly, the Defendants' [87] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE