# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KRISTOPHER BAUMANN,

    Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

**Civil Action No. 09-1189 (CKK)**

## MEMORANDUM OPINION
(October 28, 2013)

Plaintiff Kristopher Baumann, Chairman of the District of Columbia Fraternal Order of Police ("FOP") and an Officer with the District of Columbia Metropolitan Police Department ("MPD"), brings this action against the District of Columbia, Chief of Police Cathy L. Lanier, Assistant Chief Patrick Burke, Assistant Chief Michael Anzallo, Commander Christopher Lojacono, and Lieutenant Dean Welch, each in their individual and official capacities (collectively, "Defendants"). Presently before the Court is the Plaintiff's [99] Motion for Summary Judgment and the Defendants' [100] Cross-Motion for Summary Judgment. The Court previously granted Summary Judgment to the Defendants on all but one of the Plaintiff's claims. The claim remaining before the Court arises out of MPD's discipline of the Plaintiff for releasing to the media without prior authorization a recording of audio transmissions ("the recording") between members of MPD's Emergency Response Team during a barricade situation. The Plaintiff alleges that Parts VI-C-1 & 7 of the MPD's media policy – MPD General Order 204.01 – as applied to the Plaintiff in this case, constitute an unlawful prior restraint of

speech in violation of the First Amendment.  Upon consideration of the pleadings,[1] the relevant

legal authorities, and the summary judgment record, the Court finds that Parts VI-C-1 & 7 of

MPD General Order 204.01 are not unconstitutional prior restraints as applied to the Plaintiff.

Accordingly, the Plaintiff's motion is DENIED and the Defendants' motion is GRANTED.

## I. BACKGROUND

### A.    *Factual Background*

The parties generally agree as to events at issue.[2]  At all times relevant to the issue

remaining before the Court, the Plaintiff was assigned full-time to act as Chairman of the FOP,

the D.C. police union, pursuant to Article 9 of the Collective Bargaining Agreement between the

FOP and MPD.  *See* Pl.'s Stmt. ¶ 10.

On Saturday May 30, 2009, the MPD Emergency Response Team ("ERT") responded to

an incident in which a suspect barricaded himself inside a residence.  Pl.'s Stmt. ¶ 1.  During the

standoff, the following radio exchange, excerpted in relevant part, took place between members

of the ERT:

08:31:      Command to Alpha One, be advised I'm being ordered to give you
            the go to deploy gas.  Copy?

08:49:      Alpha One to ERT Two, if you deploy that gas and we are not
            prepared for that, we are not prepared to [inaudible] just yet, please
            standby for just five more minutes.

09:00:      [ERT Two] Copy, I just need communication from you because
            I'm getting, ah, issues down here.  I just need you to keep me
            informed so I can inform them because, I'm getting - pressured.

---

[1]  Pl.'s Mot. for Summ. J, ECF No. [99]; Defs.' Mot. for Summ. J., ECF No. [100]; Def.'s Opp'n,
ECF No. [102]; Pl.'s Opp'n, ECF No. [101]; Pl.'s Reply, ECF No. [104]; Defs.' Reply, ECF No. [105].

[2]  The Court shall cite only to the Plaintiff's Statement of Material Facts ("Pl.'s Stmt.") unless a
statement is contradicted by the Defendant, in which case the Court may cite to the Defendant's Response
to the Statement of Material Facts ("Defs.' Resp. Stmt."), or directly to the record where appropriate.

09:13:      [Alpha One] I understand ERT Two, 'cause I'm trying to put a couple of things in place here. If you can give me a couple of minutes, I'll be happy to brief you.

***

09:40:      Alpha One to ERT Two, would you let command know that we have been in contact with him again, and if they will please just give us a couple of minutes, I'm gonna try to resolve this . . .

09:50:      [ERT Two] . . . I'll advise.

***

10:17:      [Delta One replies to Charlie One] . . . also can you advise ERT One, Two, the Command and the Chief they're in a, ah, bad situation. I can see 'em from the front door here. So, if anything happens, they in the line of fire.

10:37:      [Charlie One] I'll tell them to move out the way . . .

Pl.'s Ex. 26 (10/1/2010 PERB Hearing Examiner's Report & Recomm.) at 10, ECF No. [89]. The incident was resolved shortly thereafter without deploying tear gas. *Id.*

The following Monday, Officer Wendell Cunningham – a member of the ERT and Vice Chairman of the FOP – contacted the Plaintiff to discuss concerns raised regarding the incident. *See* Pl.'s Ex. 1 (PERB Tr.) at 161-62. Specifically, ERT members voiced safety concerns as a result of "someone outside of ERT interfering with a barricade scene." *See* Pl.'s Stmt. ¶ 3; Pl.'s Ex. 1 (PERB Tr.) at 162.

The Plaintiff also received several calls from the media regarding the barricade. Pl.'s Stmt. ¶ 5; Pl.'s Ex. 2 (PERB Tr.) at 1471-72. On June 2, 2009, the Plaintiff was contacted by the media and advised that an MPD official had stated that tear gas had been ordered at the barricade, but that another MPD official had denied that there was an order to deploy tear gas. Pl.'s Stmt. ¶ 6; Pl.'s Ex. 3 (Baumann Dep. Tr.) at 137. The next day, at the Plaintiff's instruction, Officer Cunningham requested a copy of the transmission "over the ERT channel"

during the incident for purposes of "incident review." Pl.'s Stmt. ¶ 7; Pl.s' Ex. 3 (Baumann Dep. Tr.) at 138.  MPD released a copy of the transmission to Officer Cunningham on June 5, 2009, at which time he signed an acknowledgment that "[i]t is understood[,] the following recordings are for internal investigation only[,] there are no public requests for any of these incidents and the recordings will not be released to the public without prior, written approval from the Office of Unified Communications."  Pl.s' Ex. 8 (Final Investigation Report) at 23.  That same day, the Plaintiff listened to the MPD radio transmissions during the incident and released a portion of the recording to the media.  Pl.'s Stmt. ¶ 8.

On October 9, 2009, the Plaintiff was served with a Final Investigation Report and Notice of Proposed Adverse Action.  *See* Pl.'s Ex. 8 (Final Investigation Report) and 9 (Notice of Proposed Adverse Action).  The Final Investigation Report charged the Plaintiff with misconduct for releasing audio transmissions to the media "without receiving proper authorization from the Metropolitan Police Department and the Director of the Office of Unified Communication prior to dissemination."  Pl.'s Ex. 8 (Final Investigation Report) at 4.  The Report alleged that the Plaintiff provided the information to the media "as a means to discredit Officials of the Department, and discredit the Department as a whole."  *Id.* at 5.  On December 20, 2009, MPD issued a Final Notice of Adverse Action, citing the Defendant for violating MPD General Order 204.01, Parts VI-C-1 & 7 by releasing the audio transmissions to the media without "the prior written approval from the Office of Unified Communications" or MPD.  Pl.'s Ex. 10 (Final Notice of Adverse Action) ¶ 3.  MPD General Order 204.01, Parts VI-C-1 & 7 ("the General Order") provide that "[c]onfidential information that may jeopardize the successful conclusion of an investigation" cannot be released to the public, and "[a]ll documents not listed as releasable shall be closed to public inspection."  *See* Pl.'s Ex. 12 (MPD General Order 204.01).

The Plaintiff appealed the adverse action. On February 5, 2010, Chief of Police Cathy L. Lanier denied the Plaintiff's appeal. *See* Pl.'s Ex. 11 (Chief Lanier Letter denying appeal) at 7. In her letter denying the appeal, Chief Lanier noted that the recording related to two separate ongoing criminal investigations concerning the May 30, 2009 barricade and constituted "secure tactical communications by members of the [ERT]." *Id.* at 4.

In the testimony Chief Lanier gave to the Public Employee Relations Board on February 3, 2010, Chief Lanier indicated that she did not consider it harmful for legitimate safety concerns to be brought to the attention of the public by the D.C. police union. Pl.'s Ex. 2 (PERB Tr.) at 1314.

B. *Procedural History*

The Plaintiff filed his initial Complaint accompanied by a motion for preliminary injunction with this Court on June 29, 2009. Compl., ECF No. [1], Mot. for Prelim. Inj., ECF No. [4]. The Court denied Plaintiff's request for preliminary injunctive relief on July 11, 2009. 7/11/2009 Order & Mem. Opin., ECF Nos. [12, 13].

The Defendants filed a Motion for Summary Judgment requesting judgment in their favor on all of the Plaintiff's pending claims. Mot. for Summ. J., ECF No. [87]. On March 27, 2013, the Court granted summary judgment in the Defendants' favor as to the Plaintiff's Whistleblower Protection Act and First Amendment retaliation claims. *See Baumann v. District of Columbia*, 933 F. Supp. 2d 19 (D.D.C. 2013). The Court, however, denied summary judgment on the Plaintiff's claim that the General Order is an unlawful prior restraint because neither party employed the balancing test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) and *United States v. Nat'l Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 465-66, 468 (1995) for analyzing the constitutionality of "restraints on the speech of government employees on

matters of public concern." *Id.* at 41-42. Consequently, the Court requested further briefing on this claim.

### C. Present Cross-Motions for Summary Judgment

The parties filed cross-motions for summary judgment on the remaining claim that the General Order is an unlawful prior restraint in violation of the First Amendment. In its supplemental briefing before the Court, the Plaintiff argues that since he released the recording to the media in his capacity as lead union representative for the FOP, he was speaking as a citizen about a matter of public concern and, accordingly, any restriction on his speech must be analyzed under the balancing test set forth in *Pickering* and *NTEU*. In applying that test, the Plaintiff contends that MPD officers' and the public's interest in officers being able to speak about important matters ailing the police department far outweighs the government's speculative concerns about confidentiality and agency efficiency.

The Defendants argue that the General Order only reaches speech made by sworn or civilian MPD employees in their professional capacity, and is thus speech not protected by the *Pickering/NTEU* balancing test. The Defendants further argue that even if the Court finds that the restraints on the Plaintiff's speech must be analyzed under *Pickering/NTEU*, the General Order is narrowly tailored to protect the MPD's interest in efficient law enforcement and does not significantly impair the interest of its officers in the free dissemination of their personal views.

The Court agrees with the Plaintiff that in transmitting the recording to the media while employed as a full-time union representative the Plaintiff spoke as a citizen on an issue of public concern and any restriction on his speech must be analyzed under the *Pickering/NTEU* balancing test. However, the Court disagrees that the *Pickering/NTEU* balancing test requires judgment in

the Plaintiff's favor and, accordingly, upholds the constitutionality of the General Order as applied to the Plaintiff.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Liberty Lobby*, 477 U.S. at 248.  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id*. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### III. DISCUSSION

### I. *Applicability of Pickering/NTEU Balancing Test*

#### a. *Whether the Plaintiff released the recording in his capacity as a citizen*

The Plaintiff, in releasing the recording to the media, engaged in expressive conduct, or "speech," under the First Amendment. *See Texas v. Johnson,* 491 U.S. 397, 404 (1989) ("The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word."); *United States v. Jin-Woo Kim*, 808 F. Supp. 2d 44, 56 (D.D.C. 2011) ("The Supreme Court, however, has made clear that the First Amendment protects expressive conduct whether it is oral, written, or symbolic. There is no authority for Defendant's proposition that the First Amendment protects his ability to orally disclose the contents of a classified document but not his transmission of that document in writing." (internal citations omitted)); *Mt. Healthy City School Dist. Bd. Of Educ. v. Doyle*, 429

U.S. 274, 284 (1977) (finding that a teacher's release of a school memorandum to the media was a communication protected by the First Amendment); *Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007) (analyzing whether Representative McDermott's disclosure to the media of a recording of a third-party conversation was protected by the First Amendment without questioning that the disclosure constituted speech). "Public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). But because "the government, federal or state, [also] has a significant interest, 'as an employer in regulating the speech of its employees' in order to perform its public services effectively," *American Postal Workers Union v. U.S. Postal Services*, 830 F.2d 294, 300 (D.C. Cir. 1987), restraints on the speech of government employees speaking as citizens on matters of public concern are governed by a balancing test:

> [Restraints] are permissible where the government interest in promoting the efficiency of the public services it performs through its employees outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers' views.

*Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (describing the test set forth in *NTEU*, 513 U.S. at 466, and *Pickering*, 391 U.S. at 568). By contrast, "the First Amendment places no restrictions on the government's right to punish employees for speech made 'pursuant to their official duties.'" *Thompson v. District of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421). Accordingly, a threshold question for a public employee's First Amendment claim is "whether the employee spoke as a *citizen* on a *matter of public concern*." *Garcetti*, 547 U.S. at 418 (emphasis added).

While the parties advocate opposite legal conclusions, they have no evidentiary

disagreements as to this threshold question, so the Court can answer the question as to the capacity in which the Plaintiff spoke as a matter of law. The undisputed facts show that the Plaintiff, although an MPD officer, was assigned full-time to act as Chairman of the FOP, the D.C. police union, pursuant to the Collective Bargaining Agreement between the FOP and the MPD. At the time the Plaintiff made the disclosure of the recording to the media, he was serving in his capacity as a full-time union leader. Courts have recognized that when a public employee is acting in his capacity as a union leader, his speech is protected by the First Amendment. *See, e.g.*, *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006) ("Because Fuerst's comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff . . .[,] the Supreme Court's recent decision in *Garcetti v. Ceballos* is inapposite." (internal citation omitted)); *see also Dist. Council 20 v. District of Columbia*, 150 F. Supp. 2d 136, 143 (D.D.C. 2001) ("[S]peech in the context of union activity will seldom be personal; most often it will be political speech." (quoting *Boddie v. City of Columbus*, 989 F.2d 745, 750 (5th Cir. 1993))).

The Defendants argue that, although the Plaintiff was a union leader, in releasing the recording to the media he spoke in his official capacity as an MPD officer because his speech "owe[d] its existence to [an MPD] employee's professional responsibilities," Def.'s Mot. for Summ. J. at 1, *i.e.*, the "Plaintiff would not have had this type of access [to acquire the recording] absent his employment relationship with MPD," Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 3. This argument, however, misinterprets *Garcetti* and the thrust of Supreme Court case law on government employee speech. "*Garcetti* carves out [from First Amendment protection] speech made pursuant to an employee's official duties – not speech 'related to his official duties' or that 'concern[s] special knowledge gained through his employment.'" *Hawkins v. District of*

10

*Columbia*, 923 F. Supp. 2d 128, 139 (D.D.C. 2013) (emphasis in original). Indeed, in its cases addressing restraints on government employee speech, the Supreme Court has repeatedly recognized the significant importance of "promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion" about matters related to their employment. *Garcetti*, 547 U.S. at 419 (discussing *Pickering* and its progeny). Accordingly, the Court concludes that the Plaintiff spoke to the media as a citizen, not as an MPD employee.

### b. Whether the release of the recording was a matter of public concern

In addition, the Plaintiff's speech – releasing a recording of a radio transmission that revealed security risks to the public and MPD officers due to the MPD's handling of barricade situations – related to a matter of public concern. *See Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994) ("a matter of public concern . . . involves information that enables 'members of society to make informed decisions about the operation of their government.'" (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983))); *O'Donnell v. Barry,* 143 F.3d 1126, 1133-34 (D.C. Cir. 1998) ("important issues of Police Department policy" are matters of public concern); *Connick v. Myers*, 461 U.S. 138, 146 (1983) (describing generally that matters of public concern relate "to any matter of political, social, or other concern to the community . . .").

Accordingly, as the Court finds that the Plaintiff was speaking as a citizen on a matter of public concern, the Court shall evaluate the constitutionality of the General Order as applied to the Plaintiff by balancing the "interests of the employee . . . in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *NTEU*, 513 U.S. at 465-66 (quoting *Pickering*, 391 U.S. at 568) (internal quotation marks omitted). As the alleged prior restraint is

"accomplished through a generally applicable statute or regulation, as opposed to a particularized disciplinary action, [the Court] must also make sure that the regulation's sweep is 'reasonably necessary to protect the efficiency of the public service.'" *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474). The Court notes at the outset that the "government bears the burden of justifying its [restraint on speech]. *NTEU*, 513 U.S. at 466 (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). Moreover, "the government's burden is greater with respect to [a] statutory restriction on expression than with respect to an isolated disciplinary action. The government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468.

## II.        *The Plaintiff's First Amendment Interests*

As a government employee, and specifically a police officer, the Plaintiff and the public have a strong interest in the Plaintiff's ability to comment on matters of public concern. The Supreme Court has repeatedly recognized that "government employees are often in the best position to know what ails the agencies for which they work" and thus "public debate may gain much from their informed opinions." *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (citing *Pickering*, 391 U.S. at 572). In turn, the District of Columbia Circuit has deemed "important issues of Police Department policy" to be clear matters of public concern. *O'Donnell,* 143 F.3d 1133-34; *see also LeFande v. District of Columbia*, 613 F.3d 1155, 1160 (D.C. Cir. 2010) (MPD regulation empowering the Chief of Police to fire Reserve Corps members without process was a matter of public concern). Here, the Plaintiff wanted to speak about safety concerns to the public and the police force due to the MPD's management of barricade situations. Given the special knowledge the Plaintiff has as a police officer and the important police department policy on which he

wanted to comment, the Plaintiff and his potential audiences have a strong interest in the Plaintiff's ability to speak on the present matter.

While the Plaintiff's First Amendment interest in opining about police department policy and procedures is strong, his interest is not significantly burdened by the General Order. The parts of the General Order at issue prohibit the release to the public of a defined and narrow set of protected information; specifically, confidential information that may jeopardize the successful conclusion of an investigation, and MPD documents other than those listed as releasable to the public in the broad categories enumerated in Part VI-B of General Order 204.01.[3] Importantly, neither of these categories prevents the Plaintiff or any other officer from offering his or her personal views about MPD policy generally or the handling of the May 30, 2009, barricade situation. *Cf. Harman v. City of New York*, 140 F.3d 111, 119 (2nd Cir. 1998) (striking down regulation prohibiting employees of child welfare agency from speaking to the media without first obtaining permission from the media department in part because it covered employee speech on non-confidential agency policies and activities and "interefer[d] with employees' ability to communicate their views to the media"). Indeed, the General Order does not prevent the Plaintiff from opining to the media that after reviewing the recording he thought the MPD did not follow the proper procedures in handling the barricade situation. Part VI-F of the General

---

[3] General Order 204.01, Part VI-B lists the following as "Information that may be released to the public":
1. Factual information concerning an individual involved in an incident, such as the complainant's name and address, unless prohibited by this General Order.
2. Circumstances surrounding an incident, such as time and place, possession and use of weapons, resistance, pursuit, identity of the arresting officers, length of investigation, and a general description of items seized.
3. Information that may assist in an investigation, such as lookouts for persons or vehicles, or composites.
4. Special interest notices outlining Department initiatives, educational information, grants obtained or public safety announcements.
5. General complaint files, automated arrest printouts, traffic accident reports and reports of missing, lost or stolen property shall be open to public inspection as mandated by the D.C. Code.

Order, which sets guidelines for MPD "members participating in an interview to express personal views," demonstrates that an officer's liberty to express his or her personal views is assumed throughout the General Order.[4]

Under the General Order, officers are only limited from releasing confidential information, and only if it "may jeopardize the successful conclusion of an investigation," and MPD documents – and only *documents* – that do not fall into one of the broad categories of information that the General Order states may be released to the public.  Moreover, Part VI-C-1's restriction on the release of information is time-limited, extending only through the "conclusion of an investigation."  Once an investigation is complete, confidential information pertaining to that investigation, such as the information contained in the recording at issue, is no longer restricted by Part VI-C-1 and is presumably a "releasable" document in so far as it is information regarding "circumstances surrounding an incident."  *See* MPD General Order 204.01, Part VI-B-2.  In the present case, the General Order simply limited the Plaintiff in releasing the recording itself during two ongoing criminal investigations, not the expression of his personal views about the matter.  Chief Lanier's testimony before the Public Employee Relations Board indicating that she does not believe it is harmful for the D.C. police union to bring safety concerns to the attention of the public supports this narrow interpretation of the General Order's restriction on speech.

This limited burden on the Plaintiff's First Amendment interests is far from the "sweeping," "wholesale deterrent to a broad category of expression" involved in cases like *Harman*, 140 F.3d at 116 and *NTEU*, 513 U.S. at 480 (striking down ban prohibiting federal employees from

---

[4] With the exception of "any opinion as to guilt or innocence of the accused or as to the merits of the case," which an MPD officer cannot release to the public.  MPD General Order 204.01, Part VI-C-3.  Stating such an opinion would have a clear negative impact on the ability of the MPD to impartially investigate a case and the public and accused's confidence in the MPD.

accepting honoraria for making speeches or writing articles on any subject) on which the Plaintiff relies. *NTEU*, 513 U.S. at 467. The burden placed on speech by the General Order is more closely akin to the regulation upheld in *Weaver*, 87 F.3d at 1435, requiring prepublication review of all materials "which may reasonably be interpreted as relating to the current responsibilities, programs, or operations of any employee's agency or to current U.S. Foreign policies, or which reasonably may be expected to affect the foreign relations of the United States . . . ." While the Plaintiff argues that *Weaver* is distinguishable since it involved only a requirement of prepublication review and not the complete prohibition of speech at issue here, the General Order is far more limited in the type of speech it covers: confidential information jeopardizing an *ongoing* investigation and non-public MPD documents. Furthermore, in the instance case, the MPD restricted the release of the recording only after conducting a prepublication review in which it determined that the confidential content of the recording made it appropriate for internal investigation only. Moreover, unlike the regulations at issue in *NTEU* or even *Weaver*, the General Order's restrictions are limited to speech which has a strong "nexus" with the employee's job. *See NTEU*, 513 U.S. at 474. The speech restricted by the General Order is not simply related to the Plaintiff's employment, it is speech that only exists because of the Plaintiff's employment. Thus the Plaintiff's interest in the restricted speech is weaker and the government's interest stronger. *Cf. Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 57 (D.D.C. 2009) ("the less [a plaintiff's] speech has to do with the office, the less justification the office is likely to have to regulate it." (citing *Eberhardt v. O'Malley*, 17 F.3d 1023, 1027 (7th Cir. 1994))).

### III.    *The Government's Interests*

The Defendants justify parts VI-C-1 & 7 of the MPD's General Order 204.01 as necessary to

"protect the MPD's interest in efficient and effective law enforcement" and, more specifically, the MPD's interest in "maintaining discipline, security, and confidentiality, and esprit de corps among its officers." Def.'s Mot. for Summ. J. at 7, 8. The Supreme Court has held that the government's burden of justifying the restriction "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). In other words, the government must "demonstrate actual harm before its interests may be deemed to justify a restriction on speech . . . ." *Sanjour v. E.P.A.*, 56 F.3d 85, 98 (D.C. Cir. 1995) (citing *Edenfield*, 507 U.S. at 770-71) (striking down prior restraint in part because the government agency did not make any effort to demonstrate that the restraint at issue was adopted to address genuinely experienced harms); *see also Fire Fighters Ass'n v. Barry*, 742 F.Supp. 1182, 1191 (D.D.C. 1990) (internal citation omitted) ("the defendants must show that the plaintiffs' acts in displaying the bumper stickers in some way harmed the government's legitimate interest in maintaining departmental discipline" through the Bumper Sticker regulation).

The Plaintiff argues that the MPD's alleged "general interest in confidentiality and efficiency" is conjectural and thus insufficient to meet the government's heightened burden. While the Defendants briefs are surprisingly sparse in their discussion of actual harms, the Defendants do cite to several exhibits explaining the confidential and tactical importance of the recording to two ongoing criminal investigations. *See, e.g.,* Pl.'s Ex. 11 (Chief Lanier Letter denying appeal). In any event, "a court, in deciding whether concrete harm exists, is not limited to objective evidence presented by the government, but may draw reasonable inferences from the circumstances surrounding the event." *Fire Fighters Ass'n*, 742 F. Supp. at 1191 (citing *Hall v.*

16

*Ford*, 856 F.2d 255, 261 (D.C. Cir. 1988)).

As an initial matter, the D.C. Circuit has held that "because of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees." *O'Donnell*, 148 F.3d at 1135. The D.C. Circuit further explained in *Boehner*, 484 F.3d at 579, that "those who accept positions of trust involving a duty not to disclose information they lawfully acquire while performing their responsibilities have no First Amendment right to disclose that information." Courts have long been deferential to rules or regulations restricting government employees from disclosing confidential or otherwise protected information, even if lawfully obtained. *Id.* at 578 (finding that the House Ethics Committee rule prohibiting committee members and staff from disclosing "any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee" was "reasonable" and raised no First Amendment concerns); *see also Connick,* 461 U.S. at 153 n. 14 (observing that the government's case for regulating employee speech is strengthened when the expression violates a rule or regulation); *Snepp v. United States*, 444 U.S. 507, 516 (1998) (upholding as constitutional under the First Amendment provision in CIA contract requiring prepublication review before CIA officers published any information relating to the agency because of risk of secure information being compromised); *Weaver*, 87 F.3d at 1443 (upholding agency regulation requiring prepublication review of any employee publication relating to the work of the agency because of risk of disclosure of confidential information or information otherwise harmful to foreign relations); *Kim*, 808 F. Supp. 2d at 56-57 (upholding as constitutional under the First Amendment federal statute prohibiting the disclosure of confidential information by individuals holding a security clearance). Accordingly, the Court

grants substantial weight to the MPD's proclaimed interest in promoting agency effectiveness by restricting the disclosure of information related to its operations, including the investigation of incidents inside its police offices.

The interests the MPD seeks to protect by employing the General Order to limit the disclosure of information, like that released by the Plaintiff, are real and not conjectural. The Plaintiff released a recording to the media that contained information central to two separate ongoing criminal investigations and an ongoing internal investigation into MPD practices. In reviewing the recording before releasing it to the union, the MPD had determined that it should be for internal investigation purposes only and not released to the public. The Court can reasonably infer, especially in light of the police department's strong interest in confidentiality and discipline, that releasing the recording to the media just as the MPD was beginning to gather information to conduct these investigations, was disruptive to the MPD's ability to effectively handle these investigations.[5]

Finally, the General Order is narrowly tailored to actually protect the MPD's efficiency and confidentiality interests. Part VI-C-1 of the General Order restricts the release of confidential information and, specifically, confidential information that may jeopardize the successful conclusion of an investigation. By definition, the release of such information would compromise the MPD's effectiveness as an agency. This restriction is time-limited and extends only through the "conclusion" of an investigation, *i.e.* the period of time when the information would actually harm the MPD's operations. Part VI-C-7 restricts the release to the public of MPD documents, and only documents, "not listed as releasable." The Plaintiff argues that Part VI-C-7 provides no

---

[5] The Plaintiff argues that there is evidence in the record that the Plaintiff's release of the tape did not cause any disruption to the MPD's operations. However, the Plaintiff only cites to the opinion Officer Yarbaugh during his deposition. One officer's personal opinion about the impact of the Plaintiff's speech is insufficient evidence to make this a genuine issue of material fact.

definition of what documents are included in the prohibition and sweeps broader than necessary to achieve the MPD's confidentiality goals.  However, Part VI-C-7 must be read in the context of the General Order as a whole.  Part VI-B, which immediately precedes Part VI-C, lists all "information that may be released to the public."  Accordingly, Part VI-C-7 restricts individuals from releasing all documents for public inspection that are not included in the list enumerated in Part VI-B.  While the category of documents subsequently qualified as not releasable by Part VI-C-7 remains large, its breadth is reduced by the fact that the limitation applies only to the public *inspection* of *documents*.  Consequently, Part VI-C-7 does not prohibit oral speech related to documents "not listed as releasable" so far as that speech is not otherwise considered confidential or protected.  The Court can reasonably infer that creating a category of protected documents in an organization where confidentiality and trust are paramount is reasonably necessary to the MPD's effectiveness.  Moreover, contrary to the Plaintiff's contention, there is no risk that the application of the General Order will prohibit the disclosure of information that is not in fact confidential and documents that are in fact releasable because the General Order only prohibits the release of exactly that information.  *Cf. Harman*, 140 F.3d at 119.  In addition, in the instant case, the MPD conducted a prepublication review of the recording and determined that it contained information that made its release appropriate for internal investigation only and not for the public.  Consequently, by restricting only confidential and protected information, the General Order "restricts no more speech than is 'reasonably necessary' to achieve the government's interests."  *Weaver*, 87 F.3d at 1443 (quoting *NTEU*, 513 U.S. at 474.

### IV. *Pickering/NTEU Balancing*

Given the minimal burden on the Plaintiff's ability to speak and the government's strong interest in regulating the release of a narrow category of information that would affect the

confidentiality and effectiveness of MPD operations, the *Pickering/NTEU* balancing test weighs in favor of finding the General Order, as applied to the Plaintiff, constitutional. Most importantly, the General Order does not restrict the Plaintiff's expression of his personal views. The General Order simply restricted the Plaintiff's ability to release the recording itself at the time he did, not express his personal views on safety concerns related to the barricade situation. Indeed, Chief of Police Lanier stated that she did not find it harmful for legitimate safety concerns to be brought to the attention of the public by the D.C. police union. Moreover, the restriction on the Plaintiff's ability to release the recording is time-limited to the duration and conclusion of the ongoing investigations. Pursuant to the General Order, the Plaintiff would presumably be free to release the recording upon the investigation's conclusion or once it was determined that releasing the recording would not jeopardize the investigations. However, at the time the Plaintiff released the recording, the MPD had conducted a prepublication review of the recording and determined that, given its contents and its central relevance to two ongoing criminal investigations, the recording was only appropriate for internal review, not public review. Just as many courts have recognized before, this Court recognizes the heightened interest a police department has in regulating officer speech so as to ensure confidentiality and the effectiveness of its operations. The MPD had legitimate concerns that the two ongoing criminal investigations would be jeopardized by the release of the recording. The General Order was narrowly tailored to restrict the release of such information and, accordingly, cannot be found to be an unconstitutional prior restraint on speech as applied to the Plaintiff.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that under the *Pickering/NTEU* balancing test, the government's interest in restricting the Plaintiff's speech through parts VI-C-1 & 7 of MPD

General Order 204.01 outweighs the Plaintiff's interest in the type of speech restricted by the General Order. Therefore, parts VI-C-1 & 7 of MPD General Order 204.01 are not an unconstitutional prior restraint on speech. Accordingly, the Plaintiff's [99] Motion for Summary Judgment is DENIED and the Defendants' [100] Motion for Summary Judgment is GRANTED.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE